IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Maritza Dominguez Braswell**

Civil Action No. 23–cv–01294–MDB

WILLIAM S. PETTIGREW,

Plaintiff,

v.

DORCEY, Captain
LONG, Case Manager
ROLAND JACKSON, Lieutenant,
JOHN DOE, Major, and
JOHN DOES A-D, Correctional Officers

Defendants.

---

**ORDER**

---

This matter is before the Court on Defendants'[1] Motion for Summary Judgment. (["Motion"], Doc. No. 112; *see* Doc. No. 115 (Defendants' Statement of Undisputed Material Facts).) Plaintiff has responded in opposition (Doc. No. 121; *see* Doc. No. 122 (Plaintiff's Response to Statement of Undisputed Material Facts)) and Defendants have replied in support (Doc. No. 127; Doc. No. 128 (Defendants' Reply in Response to Statement of Undisputed Material Facts)). After reviewing the Motion, briefing, and applicable law, the Court **DENIES** the Motion.

[1] The Motion is filed on behalf of Defendants Dorcey, Long, and Jackson, who the Court will refer to as "Defendants." (Doc. No. 112.) Defendants' Motion is not filed on behalf of the Doe Defendants.

## STATEMENT OF THE CASE

The following facts are undisputed unless otherwise noted:

1. On June 30, 2021, an inmate at Sterling Correctional Facility ("SCF") named Adam Ybarra, who was affiliated with the Latino "North Side Mafia" gang, stabbed Plaintiff during "Table Time." (Doc. No. 128 at ¶ 1.)

2. Table Time was a recreational, out-of-cell, program offered to inmates housed at SCF in the Close Custody Management Control Unit/Comprehensive ("MCC"), that they were permitted to attend via daily sign-ups. (*Id.* at ¶ 2.) Table Time was part of the four hours CDOC is required to allow inmates out of their cell on a daily basis. (*Id.* at ¶ 30.) During Table Time, four inmates would be chained to one table, each with a belly chain attached to the seats and their hands secured to the tabletop. (*Id.* at ¶¶ 5–6.) Inmates are placed at the tables in cell order. (*Id.* at ¶ 7.)

3. Defendants knew there were documented incidents prior to the incident in question in which inmates escaped their restraints during Table Time and acted violently. (*Id.* at ¶ 2.) CDOC specifically knew that Mr. Ybarra himself had twice committed such acts during Table Time. (*Id.*)

4. On the day of the incident both Plaintiff and Mr. Ybarra voluntarily signed up for Table Time.[2] (*Id.* at ¶¶ 3, 40.)

5. Per policy, Table Time participants were to be pat searched and scanned with a metal detector prior to being placed at a table. Plaintiff and Mr. Ybarra were pat searched. The parties dispute whether a metal detector screening occurred. (*Id.* at ¶ 4.)

6. Once all inmates who had signed up for table time were locked to their table, the officers in the unit left the pod to address other issues. (*Id.* at ¶ 9.)

7. Mr. Ybarra then produced a homemade "cuff key," freed himself from his restraints, secured a shank from somewhere in the pod and stabbed Plaintiff. (*Id.* at ¶ 10.) The stabbing resulted in multiple puncture wounds to Plaintiff's back, chest, neck, and left arm; lacerations to his chest and neck; and a punctured, collapsed left lung that carried a substantial risk of protracted loss or impairment of the lung. (*Id.* at ¶ 76.)

8. Plaintiff was also carrying a homemade cuff key during the incident in question. (*Id* at ¶ 11.)

---

[2] Plaintiff acknowledges this fact, but says he asked to return to his cell when he saw Mr. Ybarra at his table, but certain (non-Defendant) officers refused. (Doc. No. 128 at ¶¶ 3, 8, 12, 40.)

9. The reason for the attack is disputed by the parties. Defendants say the reason was never determined and attribute the attack to Mr. Ybarra's "assaultive nature." (Doc. No. 128 at ¶¶ 13–14, 16.) Plaintiff says it was well known that a "greenlight" had been placed on him by certain black and white gang-affiliated inmates and that Mr. Ybarra inquired about carrying out the attack to curry favor with those inmates and strengthen his reputation and notoriety. (*Id.*)

10. Defendants Dorcey, Jackson, and Long were not physically present during the attack and were not among the officers who responded to it. (*Id.* at ¶ 31.) Defendant Jackson was the lieutenant in the MCC on the date of the incident. (*Id.* at ¶ 68.)

11. Plaintiff was a known target of black and white gang-affiliated inmates. (*Id.* at ¶ 15.) This stemmed from a September 22, 2016, incident where Plaintiff, who CDOC believed to be associated with a white supremacist gang, killed a potentially gang-affiliated black inmate at Limon Correctional Facility. (*Id.* at ¶ 17.) Plaintiff was convicted of first degree murder. (*Id.* at ¶ 18.)

12. This incident led to heightened tensions between black and white inmates throughout CDOC. (*Id.* at ¶ 19.) In an attempt to prevent additional violence, CDOC officials facilitated a meeting between gang leaders. (*Id.* at ¶ 20.) In 2018, while Plaintiff was housed at Colorado State Penitentiary, CDOC officials learned that the gang leaders placed a "greenlight" on Plaintiff during the meeting. (*Id.* at ¶ 20–21.) Plaintiff was informed of the greenlight by a CDOC official in 2018, but refused to cooperate with CDOC staff to protect himself at that time.[3] (*Id.* at ¶ 21.)

13. CDOC developed a housing plan which stated that Plaintiff should not be housed near black inmates or gang-affiliated white inmates. (*Id.* at ¶ 22.)

14. From 2018 to 2020, Plaintiff received multiple disciplinary convictions for threatening staff, possessing contraband, and creating disruptions. (*Id.* at ¶ 24.) In February 2021, Plaintiff pled guilty to a charge of making threats to a guard and was moved to the MCC and SCF in March 2021. Plaintiff contends he intentionally committed the infraction in order to be moved to MCC, where he believed he would be safer. (*Id.* at ¶ 25.)

15. The MCC provided the highest level of supervision for CDOC inmates. (*Id.* at ¶ 26.) Once placed in the MCC, Plaintiff was required to stay there for a defined period. (*Id.* at ¶ 27.) Protective custody was not available to MCC inmates generally, nor to Plaintiff

[3] Plaintiff contends that he did not fully appreciate the severity of the greenlight until some time in 2020, and later in 2021 when he saw inmates plotting against him in sign language. (Doc. No. 128 at ¶¶ 21, 24.) He says he eventually sought intervention from CDOC. (*Id.* at ¶ 21.)

specifically, due to his murder of another inmate. (*Id.* at ¶ 29.) Restrictive housing was available for imminent threats.[4] (*Id.* at ¶ 28.)

16. SCF knew that every MCC inmate was dangerous. (*Id.* at ¶ 34.) They also knew Mr. Ybarra had a reputation for violence. (*Id.*) CDOC has maintained an intelligence report on Mr. Ybarra that detailed incidents involving Mr. Ybarra since 2006. These include several prior incidents of assaulting staff, assaulting inmates, being in possession of homemade weapons or metal, escaping restraints, and being found in possession of homemade handcuff keys. (*Id.* at ¶ 77.)

17. CDOC intelligence staff was tasked with ensuring that inmates with documented issues between one another were not housed together. (*Id.* at ¶ 35.) In managing housing placements intelligence staff had to be aware that not every reported threat was valid. (*Id.* at ¶ 36.) Movements of inmates between pods were made with careful investigation, validation, and planning to reduce the risk of violence. (*Id.* at ¶ 37.)

18. If an inmate learned of a threat to their safety, they could fill out a "custody issue statement," which could lead to movement to a different pod.[5] (*Id.* at ¶ 38.) Inmates were told about the custody issue statement process during their facility orientation. (*Id.* at ¶ 39.) Plaintiff never filled out a custody issue statement.[6] (*Id.* at ¶¶ 41–42.)

19. Plaintiff heard a rumor that Mr. Ybarra knew of the greenlight and talked about attacking Plaintiff. (*Id.* at ¶ 44.) The strength of this rumor, and whether CDOC knew or should have known that a Hispanic (rather than black or white) inmate posed a threat to Plaintiff, is disputed by the parties. (Doc. No. 128 at ¶ 44.) But it is undisputed that CDOC intelligence staff believed that Hispanic gang members were safe pod-mates for Plaintiff. (*Id.* at ¶ 47).

20. During a meeting with Defendant Long shortly after arriving to SCF, Plaintiff discussed the greenlight. (*Id.* at ¶ 48.) However, he did not identify any specific inmates who were threats. (*Id.*) Plaintiff apparently did not attend any of his other scheduled monthly meetings with Defendant Long, but the parties dispute why. (*Id.* at ¶ 49.) Plaintiff had other contact with Defendant Long at least one other time during a cell-side discussion and through kites. (*Id.* at ¶ 52.) The parties dispute whether the cell-side discussion

[4] The parties dispute how long an MCC inmate could be placed in restrictive housing. Defendants say 15 days. (Doc. No. 128 at ¶ 28.) Plaintiff says it was longer. (*Id.*)

[5] Plaintiff disputes that this was the only way to get moved to a different pod. (Doc. No. 128 at ¶ 38.)

[6] Plaintiff says he nevertheless *did* tell Defendants about his concerns via other means. (Doc. No. 128 at ¶¶ 41–42.)

involved Plaintiff making specific statements about who he believed was threatening him. (*Id.*)

21. Plaintiff once had a cell-side discussion with Defendant Jackson about possible danger. (*Id.* at ¶ 54.) Plaintiff also sent kites to Defendant Jackson in which he sought to be moved. (*Id.* at ¶ 31.)

22. Plaintiff talked to Defendant Dorcey on May 5, 2021, and says he told him that Mr. Ybarra was a "dangerous threat." (*Id.* at ¶ 56.) The parties dispute whether Plaintiff told Defendant Dorcey that Mr. Ybarra posed a specific threat to Plaintiff. (*Id.* at ¶ 57.) Defendant Dorcey told Plaintiff he should be safe in the short term due to a COVID lockdown in the unit. (*Id.*) There is no evidence Defendant Dorcey took any action related to this conversation. (*Id.*) Defendant Dorcey was no longer captain of the MCC on the day of the attack. (*Id.*)

23. The CDOC's administrative grievance process is a three step process requiring the inmate to file Step 1, Step 2, and Step 3 grievances. (*Id.* at ¶ 60.) A Step 1 grievance must be filed within 30 days of an incident. (*Id.* at ¶ 61.) "The DOC grievance procedure is not available to offenders currently housed outside of Colorado, or housed with the Federal Bureau of Prisons, pursuant to the Colorado Interstate Corrections Compact." (*Id.* at ¶ 62 (quoting Administrative Regulation 850-04).)

24. Plaintiff's Step 1 grievance related to the incident was due by July 30, 2021. (*Id.* at ¶ 63.) The grievance was filed July 25, 2021. (*Id.* at ¶ 65.) CDOC's response to the grievance was filed July 30, 2021. (*Id.* at ¶ 66.)

25. Plaintiff was transferred out-of-state to protective custody on July 29, 2021. (*Id.* at ¶ 64.) The parties dispute whether Plaintiff attempted to pursue his grievance after being transferred. (*Id.* at ¶ 67.)

## LEGAL STANDARD

### I. Motion for Summary Judgment

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a

material matter." *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but instead, must designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; see also Fed. R. Civ. P. 56(c).

Whether there is a genuine dispute as to a material fact depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury," or conversely, whether the evidence "is so one-sided that one party must prevail as a matter of law." *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986)). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal−Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248). "Where the record taken as a whole could not lead a rational trier of fact to find for the [nonmovant], there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## II. Qualified Immunity

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Under the doctrine of qualified immunity, "government

officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, when a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted).

## ANALYSIS

Plaintiff asserts a single Eighth Amendment failure to protect claim based on Defendants' failure to move him out of his housing pod, resulting in the incident described *supra*. (*See* Doc. No. 1.) Defendants now seek summary judgment on this claim.

As a threshold matter, Defendants argue Plaintiff failed to exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA") prior to filing suit, requiring judgment in their favor. (Doc. No. 112 at 10.) Defendants then argue that, even setting aside the exhaustion issue, there is no evidence Plaintiff was subject to an objective risk of serious harm prior to the attack, and, even if he was, there is no evidence Defendants were deliberately indifferent to that risk. (*Id.* at 19.) Defendants also contend they are entitled to qualified immunity. (*Id.* at 19–21.)

### I. Administrative Exhaustion

The PLRA provides that an inmate may not assert a claim under 42 U.S.C. § 1983 until "such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhausting

CDOC's grievance process requires an inmate to complete three steps: a Step 1 grievance, a Step 2 grievance, and a Step 3 grievance. (Doc. No. 128 at ¶ 60.)

Defendants argue that Plaintiff failed to exhaust his administrative remedies prior to filing this suit because his Step 1 grievance was inadequate and he did not complete Steps 2 and 3. (Doc. No. 112 at 10; Doc. No. 127 at 1–4.) Plaintiff responds he had no exhaustion obligation because the CDOC process became unavailable when he was transferred out of state, and thus Defendants' argument must be rejected regardless of whether the grievance he filed provided adequate notice of this case. (Doc. No. 121 at 3–5.) Plaintiff alternatively argues that even if exhaustion applied, his July 25, 2021, grievance was adequate, and his failure to complete Steps 2 and 3 stemmed from CDOC's unwillingness or inability to engage in the process after he was transferred out of state. (*Id.*)

Plaintiff's Step 1 grievance was filed July 25, 2021, five days prior to the July 30, 2021, deadline to file a grievance regarding the stabbing incident. Although this filing was timely, Defendants contend it was inadequate because it complained about Table Time generally and did not put CDOC on notice of this failure-to-protect claim. (Doc. No. 112 at 10.) The Court disagrees. Though certain aspects of Plaintiff's Step 1 grievance generally complained about the safety of Table Time, the grievance also identified the June 30, 2021, incident specifically, stating that Plaintiff "was sent to the hospital" after participating in that Table Time. (Doc. No. 112-24.) It framed that incident as part of a pattern of "repeated assaults that occur but are ignored" by CDOC and it expressly invoked CDOC's "deliberate indifference" to the danger. (*Id.*) That is considerably more than a generalized policy complaint. Although the grievance did not specifically fault Defendants for failing to move Plaintiff away from Mr. Ybarra, perfect

overlap between a grievance and a later complaint is not required so long as the two share a factual basis. *See Kikumura v. Osagie,* 461 F.3d 1269, 1285 (10th Cir. 2006) ("[A] grievance satisfies § 1997e(a)'s exhaustion requirement so long as it provides prison officials with enough information to investigate and address the inmate's complaint internally."), *overruled on other grounds as recognized in Robbins v. Okla.*, 519 F.3d 1242, 1246 (10th Cir. 2008); *see, e.g.*, *Hall v. Oliver*, 2017 WL 1437290, at *5 (D. Colo. Apr. 21, 2017) ("[E]ven though Mr. Hall's grievance did not mention the ultimate legal theory advanced in this case, he still provided enough information about the nature of the alleged wrong to enable prison officials to investigate and address Mr. Hall's complaint before he filed suit."). This grievance, which complained that Plaintiff was stabbed during Table Time because CDOC ignored a known and recurring danger, sufficiently overlaps with Plaintiff's failure-to-protect claim.

As to Plaintiff's Step 2 and 3 grievances, the PLRA requires exhaustion only of remedies that are "available." 42 U.S.C. § 1997e(a); *Ross v. Blake*, 578 U.S. 632, 642 (2016) ("An inmate ... must exhaust available remedies, but need not exhaust unavailable ones."). Whether a remedy is available, and what a prisoner must do to exhaust it, is determined by the prison's own procedural rules rather than the PLRA. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (saying the "boundaries of proper exhaustion" are defined by "the prison's requirements, and not the PLRA"). CDOC Administrative Regulation 850-04 states, "[t]he DOC grievance procedure is not available to offenders currently housed outside of Colorado, or housed with the Federal Bureau of Prisons, pursuant to the Colorado Interstate Corrections Compact." (Doc. No. 112–26 at 2; Doc. No. 128 at ¶ 62.) It is undisputed that Plaintiff was transferred to out-of-state custody on July 29, 2021, and has remained outside of Colorado since. (Doc. No. 128 at ¶ 64.) Because

Plaintiff's Step 1 grievance adequately raised his claim, and his failure to complete Steps 2 and 3 is excused by the unavailability of remedies, Defendants are not entitled to summary judgment on exhaustion grounds.[7]

## II. Failure to Protect

The Eighth Amendment requires prison officials to "take reasonable steps to protect the prisoners' safety and bodily integrity," *Berry v. City of Muskogee*, 900 F.2d 1489, 1499 (10th Cir. 1990), including the prisoner's right to be "reasonably protected from constant threats of violence ... from other inmates." *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996) (quoting *Ramos v. Lamm,* 639 F.2d 559, 572 (10th Cir. 1980)). Though "officials ... cannot 'absolutely guarantee the safety of their prisoners,'" *Cox v. Glanz*, 800 F.3d 1231, 1247–48 (10th Cir. 2015) (quoting *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999)), their "deliberate indifference to a substantial risk of serious harm to an inmate" violates the Constitution. *Riddle*, 83 F.3d at 1204 (cleaned up).

The failure-to-protect framework is composed of an objective and subjective component. The objective prong asks whether the conditions posed a "substantial risk of serious harm." *Gray v. Sorrels*, 744 F. App'x 563, 568 (10th Cir. 2018) (quoting *Riddle*, 83 F.3d at 1204). Meanwhile, the subjective prong is satisfied if the inmate "present[s] 'evidence of the prison official's culpable state of mind. He must show that the prison official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Id.* at 568 (quoting *Estate of*

[7] Even assuming the Step 1 grievance had been inadequate, the adequacy of that grievance may well be immaterial here. If a plaintiff cannot fully exhaust their remedies, it arguably does not matter whether they exhausted the first step. The Court need not resolve that question, however, because it finds Plaintiff's Step 1 grievance was adequate.

*Booker v. Gomez*, 745 F.3d 405, 430 (10th Cir. 2014)). "[T]he official must have been both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must have also drawn the inference." *Requena v. Roberts*, 893 F.3d 1195, 1215 (10th Cir. 2018) (cleaned up).

**A. Objective Prong – Substantial Risk of Serious Harm**

The Court first considers whether there was an objective substantial risk of harm to Plaintiff. Here, the relevant condition is Plaintiff's pod placement. Plaintiff does not contend that Defendants violated the Eighth Amendment by operating Table Time or by his attendance at it; his claim is that they failed to protect him by leaving him housed in a pod he was asking to leave, and vulnerable to a dangerous inmate Plaintiff previously identified by name. The objective question is therefore whether Plaintiff's continued placement in the pod posed a substantial risk of serious harm. Viewing the record in a light most favorable to Plaintiff, as it must at this stage, the Court concludes that a reasonable jury could find the objective prong satisfied.

First, Plaintiff was a specifically targeted inmate. It is undisputed that gang leaders placed a greenlight on Plaintiff, that CDOC was aware of it, and that Plaintiff remained a known target in 2021. That status distinguished Plaintiff from the general inmate population. He was not merely housed among dangerous inmates, but was a marked man within a population where, on this record, a jury could conclude that his greenlit status was widely known.

Second, a jury could conclude that Plaintiff was housed in a pod with inmates who knew he was greenlit, including Mr. Ybarra—an inmate with a documented capacity to carry out precisely the kind of attack Plaintiff feared. CDOC's own intelligence records catalogued Mr. Ybarra's history of assaulting other inmates, possessing homemade weapons and handcuff keys,

and escaping his restraints. (Doc. No. 128 at ¶ 77.) The Court does not rely on any finding about Mr. Ybarra's state of mind or motive; his subjective reasons for the attack are disputed and need not be resolved here. What matters at this stage is that Plaintiff, aware of the danger, specifically identified Mr. Ybarra as the inmate he feared, and asked to be moved away from him. The record also contains evidence—disputed, but which the Court credits at this stage—that Mr. Ybarra had spoken of "getting" Plaintiff. Taken together and in the light most favorable to Plaintiff, this evidence distinguishes the risk here, from the general risk of being placed in a unit where every inmate is assaultive.

Third, the conditions of the unit gave that danger a recurring opportunity to be realized. MCC inmates were required to receive out-of-cell time, and Table Time was the principal program through which they received it. Table Time repeatedly placed pod-mates in restrained proximity at shared tables, and inmates had previously defeated their restraints and attacked others in that setting. It thus provided a structured and recurring occasion on which the danger of Plaintiff's placement could be, and ultimately was, realized.

No one of these circumstances, alone, would suffice. But their convergence—a marked inmate, housed with an assailant both capable of and interested in harming him, under conditions that repeatedly placed the two in restrained proximity—might demonstrate that Plaintiff was incarcerated under conditions posing a substantial risk of serious harm. In other words, it will be for the jury to decide whether Plaintiff has presented enough evidence to satisfy the objective prong.

**B. Subjective Prong – Deliberate Indifference to the Risk**

The subjective component requires that each Defendant knew of and disregarded an excessive risk to inmate health or safety. Said another way, the evidence must demonstrate that Defendants were (or must have been) aware of facts from which the inference of a substantial risk could be drawn, and it must show that Defendants actually drew that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A factfinder may infer that an official drew the inference "from the very fact that the risk was obvious," and evidence that a risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" can support a finding that the official "must have known" of it. *Id.* at 842–43. Whether an official had the requisite knowledge "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[.]" *Id.* at 842.

Importantly, the inquiry is focused on a substantial risk of serious harm, not the identity of any particular assailant. Thus, "a prison official [may not] escape liability... by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Id.* at 843. The question here is therefore not whether a Defendant specifically foresaw that Mr. Ybarra would attack Plaintiff, but whether each Defendant perceived that Plaintiff faced a substantial risk of serious harm from his placement and failed to respond reasonably.

Because section 1983 does not permit liability on a theory of collective knowledge, the Court considers each Defendant's awareness individually. However, several facts bear on all three, and the Court begins with those.

First, it is undisputed that each Defendant knew Plaintiff was subject to a greenlight and that he was a known target within the institution. (Doc. No. 128 at ¶¶ 15, 20, 21.) This was not a

generalized or speculative concern. It was a validated threat, documented by CDOC and known to staff, marking Plaintiff as an inmate whose safety required particular attention.

Second, it is undisputed that each Defendant knew the MCC was an exceptionally dangerous unit. (Doc. No. 128 at ¶ 34.) The danger was not merely theoretical: the record reflects that inmates in the unit had, on multiple occasions, defeated their restraints and attacked others during out-of-cell programming, and that security measures required continual revision. (*Id.* at ¶ 2.)

Third, it is undisputed that Plaintiff asked each Defendant to move him. The specificity of Plaintiff's communications varied among the Defendants. As to Defendant Dorcey, the evidence is strongest. Plaintiff testified that he told Defendant Dorcey the inmate threatening him was housed in cell 106 and was named Ybarra, and that Dorcey acknowledged he knew who Mr. Ybarra was, and that Plaintiff asked Dorcey to "move me away from that dude." (*Id.* at ¶ 57.) Plaintiff says he told Defendant Dorcey that Mr. Ybarra was a "dangerous threat." (*Id.* at ¶ 56.) And Defendant Dorcey, as captain of the unit, was independently familiar with Mr. Ybarra, whose history of assaults was documented in CDOC's records. (*Id.* at ¶¶ 34, 77.) Indeed, Defendant Dorcey referred to Mr. Ybarra as "the tip of the spear when it came to assaults." (Doc. No. 122-1 at 99:19–25.) Taken together and viewed in Plaintiff's favor, this evidence could permit a reasonable jury to find that Defendant Dorcey perceived and disregarded a substantial risk to Plaintiff.

The evidence regarding Defendant Long is less strong, but still sufficient to reach a jury. Defendant Long was Plaintiff's case manager, the official through whom placement concerns ran. (Doc. No. 128 at ¶¶ 38, 48.) Plaintiff raised the greenlight with him, sent him kites seeking

a move, and spoke with him about his placement. (*Id.* at ¶¶ 42, 48, 52.) Plaintiff also contends Defendant Long indicated he knew who was threatening Plaintiff during one of their conversations.[8] (*Id.* at ¶ 21.)

The evidence is most generalized as to Defendant Jackson. Plaintiff sent Defendant Jackson kites reporting that he feared for his life and needed to be moved, and discussed the same with him cell-side. (*Id.* at ¶¶ 21, 31, 54.) A request to be moved communicates that the inmate perceives his placement itself to be the source of danger. And though jail officials cannot accommodate every placement request they receive, a jury could find that these requests—directed to officials who knew Plaintiff was greenlit and who knew the character and history of the unit—gave those officials enough information to infer, and that they did infer, that Plaintiff faced a substantial risk of serious harm, which they then disregarded.

Of course, perceiving a risk does not by itself establish liability. An official who responds reasonably to a known risk is not liable even if the harm occurs. *Farmer*, 511 U.S. at 844. Here, when Plaintiff requested to be moved Defendant Dorcey reassured Plaintiff that he was safe during the COVID-19 lockdown and that he would "look into it," but there is no evidence of what, if any, action Defendant Dorcey took on this front. (Doc. No. 128 at ¶¶ 57–58.) Defendant Long told Plaintiff that his placement was "non-grievable" and declined to provide him the paperwork to pursue a move. (*Id.* at ¶ 52) Defendant Jackson took no action. (*Id.* at ¶ 54).

Defendants say these actions were reasonable given the protective circumstances then in place and the safety protocols available in the unit. (Doc. No. 112 at 11, 13.) That may be.

---

[8] The support for this assertion is relatively weak and appears supported only by Plaintiff's own self-serving statements. (Doc. No. 123-2 at 11; Doc. No. 1 at 17.) Still, given the additional evidence on this issue, the Court finds it appropriate to deny summary judgment.

Indeed, the record contains evidence that intelligence staff regarded the greenlight threat as emanating from black and white inmates rather than from a Hispanic inmate like Mr. Ybarra. (Doc. No. 128 at ¶ 13.) It also suggests that Plaintiff's communications were in some instances vague, and that Plaintiff himself described generalized threats as a routine feature of the unit. (*Id.* at ¶¶ 50, 55.) A jury may ultimately credit that evidence and find for Defendants. But viewing the evidence in the light most favorable to Plaintiff, a reasonable factfinder could also conclude the opposite.

In sum, there are genuine disputes on the subjective prong and they cannot be resolved on summary judgment.

**C. Qualified Immunity**

Finally, the Court addresses Defendants' assertion of qualified immunity. Even if a constitutional violation is established, qualified immunity shields officials from suit unless the plaintiff shows the violated right was clearly established at the time of the conduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

A right is clearly established when existing precedent places the constitutional question "beyond debate," such that every reasonable official would understand that his conduct violated it. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). A plaintiff need not identify a prior case with identical facts. *Id.* Officials may be on fair notice that their conduct is unlawful "even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), particularly where the unlawfulness of the conduct is apparent from established general principles. The inquiry is whether the contours of the right were sufficiently clear that a reasonable official in each Defendant's position would have understood that failing to act in the face of a known, substantial

risk to Plaintiff violated the Eighth Amendment. *Id.* at 739 ("For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Here, the right was clearly established. The Supreme Court held in *Farmer* that a prison official violates the Eighth Amendment when he is deliberately indifferent to a substantial risk that an inmate will be seriously harmed by another inmate. 511 U.S. 825. Since *Farmer*, the Tenth Circuit has applied that principle to circumstances materially similar to those at issue here. For example, in *Wilson v. Falk*, an inmate who faced threats from a prison gang reported his fears to prison officials and sought to be moved, but was not; he was later assaulted. 877 F.3d 1204, 1208–09 (10th Cir. 2017). The Tenth Circuit recognized that an inmate has a clearly established right to be protected from a known substantial risk of assault by other inmates. *Id.* at 1209 (citing *Howard v. Waide*, 534 F.3d 1227, 1242 (10th Cir. 2008) for the proposition "that prison inmates have a clearly established Eighth Amendment right to be protected from substantial risks of assault"); *see also Howard*, 534 F.3d at 1242 ("Howard's claim survives because he has presented evidence, both direct and circumstantial, that prison officials knew he faced an ongoing risk from a prison gang with a substantial presence in the facility, and that they had reasonable responses available to them."). In other words, by June 2021, when the incident at issue occurred, prison officials were on notice that if an inmate faces a substantial risk of serious harm from another inmate, the failure to take reasonable steps in response would violate the Eighth Amendment.

Defendants' argument—that no case has addressed a constitutional violation arising from an attack during Table Time—is not persuasive. Qualified immunity does not require direct overlap with a prior case. *See al-Kidd*, 563 U.S. at 741; *Hope*, 536 U.S. at 741. The right at issue here is the established right to reasonable protection from a known substantial risk of inmate violence, not the right to be free from inmate assaults during a particular program. *See, e.g.*, *White v. Parks*, 2025 WL 2614109, at *12 (D. Kan. Sept. 10, 2025) (finding "[o]ur Circuit's cases make it clear .... Prison guards aren't free to ignore substantial threats to inmate safety when they know about those threats" and "Prison guards aren't free to ignore pleas for help when they know that other inmates pose a threat to an inmate's safety"). Accordingly, Defendants are not entitled to qualified immunity.

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** Defendants' Motion for Summary Judgment (Doc. No. 112). An order setting trial and pretrial dates will follow.

Dated this 23rd day of September, 2026.

**BY THE COURT:**

Maritza Dominguez Braswell
United States Magistrate Judge